Thank you, Your Honors. May it please the Court. My name is Sarah Jane Hunt and I represent the appellants in this case, the student D. L. and his parents, Frankie and Molly Jane Landon. Our issue is whether or not the District Court erred in reducing appellants' tuition reimbursement, and we contend that it did. By way of background, a hearing officer on the Missouri Administrative Hearing Commission heard this matter in April of 2017. All of the briefing was submitted to the District Court on the initial appeal by November 2017. We did not have an order until June 2018. After financing two years of litigation and funding two years of private education at a private placement, Giant Steps, and by that I mean it's a private school that serves children with disabilities. After two years of financing both of those things, the parents found out that they were in fact right. The District Court of St. Louis Public School District denied their son a FAPE, a Free and Appropriate Public Education. However, after reading that opinion in full, they realized that their victory was an empty one. That even though they had won, and even though the factors on which the Court overturned the Administrative Hearing Commission's order were quite strong, it was his decision to reduce the tuition reimbursement by 70%. In the initial opinion, we didn't even know why. There was no explanation for why the reduction was made. The parents submitted a motion for an amended judgment requesting a reconsideration of that opinion, and then the Court in October issued a new ruling stating that equitable considerations are what justified the reduction. Those equitable considerations were not supported by the record. The broad highlights of what those equitable considerations were, was the school district's willingness to amend the student's IEP, the parents' supposed failure to communicate with the district, and the placement that the school district had selected for the student that was ultimately rejected by the parents, and the District Court said that rejection was justified, he viewed it as an equitable consideration that sometime after the IEP, that that school stated that it had a sensory room and could then serve children with autism. Going to that last point, as I understand what Judge Sippel said, was that the school that the school district wanted to place the student at was, I believe it was Madison School, is that right? That is right. And he said at the time that they did the IEP, that Madison was not an appropriate placement because they didn't have trained staff to deal with autism, they didn't have the right facilities and so on and so forth. And therefore, you were justified in the private placement. But that at some point, six months later, the school district decided, okay, we're going to remedy that problem, we're going to get the staff, we're going to get the facilities. And therefore, at that point, your reimbursement is cut off. Was there any communication between the school district and the parents over the change in Madison School? And I guess it sort of goes with your other point, whose responsibility is it to be in communication about any changes? There was not. And I would state that it would have no idea when or if any changes had been made. And what we can say is this court has said very clearly that an IEP is supposed to be looked at at the time the IEP was made. Because parents have to have all the information in front of them to be able to make a reasonable decision as to whether they should agree to the IEP or challenge it. And in this case, it doesn't, even if there had been changes to Madison, that information was not available to the parents at the time the IEP was made. Further, we actually don't know that the school improved. There is one line from the principal at Madison, his name is Marvin Eccles, in which he says, there's now a sensory room, and by the way, we have two kids with autism. They were going to place my client at that school who also has an autism diagnosis, despite the fact that they didn't have any supports for him there. So the fact that there could be a sensory room, we don't know what's in it. We don't know if they have staff to actually run it. We don't know if they have occupational therapists to write the plans to give the kids to be able to utilize the sensory room in an effective way. We don't know anything about it. There is, within the state plan, what's called a 30-day resolution period. So if the school had made changes to Madison and thought that they were adequate enough that it could change the parents' mind about the placement decision that they had made, that was the time to tell them. And they didn't. What's the standard of review for us here? Yes, so the standard of review is de novo but, essentially. I mean specifically on the denial of the full reimbursement. What you described, at least the district court described it as an equitable decision. Correct. So issues of law are reviewed de novo except it is somewhat bonded. At this level it is reviewed de novo. The district court reviews it needing to have some deference to the Administrative Hearing Commission. Findings of fact are reviewed under clear error. But I would state that the decision here was clearly erroneous. You have the case law coming out of this circuit that is very clear about what you're supposed to look at as to when an IEP is judged effective or ineffective. And that is at the time of the IEP meeting. What happened at Madison after does not matter. And even if it did matter, we have an IEP that does not provide the supports that he needs. So another reason that the district court found that the IEP was denying a FAPE is because they removed services that years and years and years of IEPs and evaluations, which were conducted by the district, said that he needed, were removed from his IEP entirely. So once again, what happened at Madison after the IEP meeting should not matter. However, even if they were able to improve the school to such a way that it could be conducive to this student being able to get a free and appropriate education, the parents didn't know about it, and his IEP didn't provide those services. So another factor in which he relied on to state that it was justified, and a 70% reduction is extensive. To me, that would be some very unreasonable behavior. When we look at these cases that are justifying the reduction, we're looking at things the parents did to essentially contribute to the failing IEP. So we have parents who don't show up for meetings. We have parents who do not provide records. We have parents who are adequately refusing to have their child evaluated. They're actively acting in a way in which the IEP that they end up with, while not providing a FAPE, is due in part to the parents' actions. Here we don't have that. The court stated that the parents failed to communicate with the district about the IEP. And this is one that is just absolutely contradicted by the record itself. In the state of Missouri, under the Missouri State Plan, we are permitted to do discovery, and we requested all of the communications between the district and the parents regarding the allegations of this case. To my knowledge, they gave us all of them. Never once did anyone from the school request any data from the parents or request anything from the parents that they did not comply with. In fact, what you will see is the parents actively reaching out to the school over and over and over again and being ignored. And then, because it's discovery, we have the benefit of the communications that are going on behind closed doors in which they are saying, he does not belong here. The parents should not assume he can come back here. You know, I'm just actually not going to respond to them at all. So that kind of covers the two prongs, which would be that the school was willing to amend the IEP, when in fact, Frankie Landon emailed the district asking for the IEP to be amended and was then told that the student was unenrolled from the school entirely. And it took a month for her to be able to get them to agree to set an IEP meeting and then re-enroll him. And then, even after the IEP meeting, we have Frankie Landon continuously emailing the school asking for a copy of the IEP. You know, the writing was kind of on the wall for them at that point. They did not walk into that IEP meeting thinking that things were going to go well. Judge Sippel, on page 10 of his original order, said that after the IEP in November 2016, an individual by the name of Hagen was charged with responsibility for preparing the IEP plan, the written document. And that he requested data from both Great Circle and the Landons, but neither responded. Are you saying that's not correct? I am saying that's not correct. So all of the emails between Mr. Hagen and the parents are in there. There are several times, again, Frankie Landon is the one initiating. Could I have a copy of the IEP? When are we going to have the IEP meeting? And Mr. Hagen... Well, this was after the meeting. And after the meeting, again, she's asking. So the meeting occurred on November 7th. She doesn't receive, the parents do not receive a copy of the IEP until November 22nd. And Ms. Landon is continuously asking for information between those two points. At no point does Mr. Hagen ask for data from Frankie Landon. It's simply not supported by the record. And I think that I'm going to reserve the rest of my time, unless you have any other questions. Counsel, could I ask you a question on the underlying determination here, related to the IEP? I'm a little confused about who has the burden at the Administrative Hearing Commission. My understanding was that the party requesting the modification, and in that case it would be the parents, have the burden. But the district court here, in my reading of the opinion, found that the school district bore the burden of proof at the commission. Is my understanding accurate that I may have a disagreement with the court on the burden of proof? Yes, I also have a disagreement with the court. He was wrong in stating that the district had the burden of proof. However, when you, oh, I'm sorry. So doesn't that matter? I mean, we've found before in West Platte that where, you know, the burden of proof is incorrect. And I think in that case, it was at the AHC and the district court used the wrong burden of proof. But in that case, we actually were reversed and reminded because we found that the confusion about the burden of proof infected the court's conclusions. And I'm wondering why isn't that the same here? If you concede that the burden was misapplied. It was not misapplied. So he stated, he wrote it in an umbrella paragraph that you will find in many opinions that line out the law, burdens of proof, et cetera. He wrote the he did not apply that burden of proof. So we are not, we're also not talking about a case in which there is an evidentiary tie. Well, but as I understand it, you didn't, the parents, and I don't know who was litigating the case, but it was a Dr. Constantino. There was a letter or a summary submitted to the IEP meeting, but he didn't appear. Is it Dr. or Ms. Wood didn't testify or go to the meeting? And I'm just wondering, doesn't that matter where you would have had the burden there to change the IEP when maybe you didn't produce the evidence necessary for the school district to reach the right conclusion? So first I'll address the burden issue here. And so Bloggett versus Commissioner, this is a case out of the Eighth Circuit in 2005. It says where both parties offered evidence where there is no evidentiary tie, any improper assignment of the burden of proof is harmless since the party supported by the weight of evidence will prevail regardless of which party bore the burden of persuasion, proof, or preponderance. And here there is no evidentiary tie. And to your point about people who did or did not attend the meeting, it would not be practical, especially in this case. Dr. Constantino is a, there are not a lot of child psychiatrists in general in this country. He is a very well-renowned, respected psychiatrist. To require him to go to every IEP meeting of the children he serves would just, it would not be possible. And so what the parents did in this case is they got the recommendations of Dr. Constantino and they provided them to the IEP meeting prior to the IEP meeting. And as anyone knows who has children, or knows children, or knows anybody in a school district, if they want something else, if they want records, if they need more, I mean they are sending forms home to sign all of the time, they could have done that. If that was not enough, if they needed to talk to Dr. Constantino to be able to ask him questions about his recommendations, the school could have done that, but they didn't because they had already decided where this child was going. And that is demonstrated by the fact, as we talked about Mr. Hagan, he didn't, he is frantically emailing people within the school saying, I don't know how I'm going to write an IEP for this child because I don't know anything about him. I taught him for seven days, of which he left almost every day early. Nobody is responding to me. I'm getting no data from Great Circle. He didn't actually ask for that data until after the meeting, which is not something you're supposed to be doing. He didn't have any information to go on. But what he did have were the recommendations of this psychiatrist, the concerns of the parent that they had been talking about for a very long time, and he didn't follow up on any of those things. And for that reason, I do not think that the, I think that while the district court stated the incorrect burden initially, the actual application of the evidence and the weighing of the evidence, it was clear that this was not a tie. That there was scant, if any, evidence to support the district's decision to remove whole categories of services from the child's IEP, to put him in a placement that can't serve him. And if you do not mind, I'd like to reserve the rest of my time. You may. Thank you. Mr. Brink, that lectern will raise, there's a switch if you want to raise it up. Good morning, your honors. My name is John Brink and I represent the St. Louis Public Schools. May it please the court. A good place to start is with Justice Stevenson's comments in his concurrence in Schaefer v. Wiest, where he said that courts should presume that public school officials are properly performing their difficult responsibilities under the IDA. Because this case shows those responsibilities really are difficult and sometimes they're really difficult. There are various standards of review for courts that reflect that premise that were stated by Justice Stevens. This case is primarily about how the district court failed to adhere to most of the standards of review, failed to support its reasoning with evidence in the record, and also failed to properly apply the burden of proof. Before getting to some of the points I was going to make, I'm going to try and address some of the things that came up in the prior argument. With respect to the reimbursement issue, when you asked about Judge Kobus, the standard of review, I believe it's abuse of discretion. Ecuador Little Reef, in a case like this, is left to the broad discretion of the court. And in this case, the reasons the district court gave are fully supported by the record. With respect to the issue about the communication and Mr. Hagan's request, my recollection is that in the hearing there was a question to him along those lines. I believe he responded that he made a request. I don't believe that he said he made it by email. Beyond that, I don't know anything else in the record that reflects that. So I don't think it categorically can be said that he never made that request. Also, a note with respect to the sensory room. First of all, Dr. Constantino never uttered that phrase in the hearing. I think, sensory room. So the notion, even from the district court, that somehow that was required for D.L. to have as a part of his IEP, there's virtually no evidence about that. But again, Dr. Constantino never said those words. With respect to the sensory room at Madison, the evidence shows that at the time the parent visited Madison, there was discussion about the fact that at the time they were working on putting in a sensory room. So at the time of the hearing especially, it wasn't news to anyone to hear that there was a sensory room at that time. Is it clear in the record at all when the parents knew that the room had been constructed? Or am I misunderstanding? I understand from what you said before the hearing, there was a discussion that there was a plan to build the room. Was there ever communication when the room was constructed and when did that occur? As far as I know, the first time that was known was at the hearing, when there was the testimony. But also, I don't think at the time there was any clear information. Again, in the hearing there wasn't testimony about the need for a sensory room. And so I don't think there was even a point for the district. It was clear that that was some kind of an overriding issue. So again, the standard of review is abuse of discretion. One of the things that I think... I want to just follow up on that. At the end of the day, what I understand Judge Semple to be basically saying was, Madison wasn't an appropriate placement at the time of the IEP in November of 2016. But it later became appropriate because of the sensory room and plus additional trained staff. Was there any communication between the parents and the school district after they placed the student in the private placement? Or was it just, okay, we're both just going to litigate now this issue? Well, there was communication about arranging... I mean, getting the IEP document finished and actually written. And also arrangements to attend Madison. So there were emails about that. But I would note, kind of along those lines, with respect to the notice the parents provided at the IEP meeting, that when asked about the parent... the parent was asked about their expectation of what that meant to do that notice, the parent said, we go ahead and send him to a private school and we'll come here and decide where we ought to go. So the parent's expectation when they gave the district that note, the letter at the end of the IEP meeting, was there was going to be a due process hearing. And the district court agreed with the hearing commission on that point. One of the things the court noted when it talked about the expert considerations was that the parents failed to take other to bring the complaint. So basically the idea that they provided the notice, the things that they did, even the visit to Madison was premised only on, we're going to do these things so that we can file the due process complaint. And that factored into the... Well, I guess what bothers me is, because I've been in a couple cases previously where the school district's not able to accommodate the needs of the child. And they end up putting the child in private placement. But because of the cost, the school district then makes changes to a program so that they can accommodate the student. But I've always understood that at some point there's some communication between the parents and the school district to indicate these changes have been made. So that the deficiencies that existed before no longer exist. But I understand in this case there was no communication like that? Well, I mean, I think partly, you know, if you look at the complaint, as far as I recall, and there was never an allegation specifically that a sensory room was something that was required. That was just not something that was ever clarified as this is something that has to happen. So you're saying the communication didn't occur then? Because no one knew it was a key issue until the district court hearing? I didn't. Well then, didn't the district court abuse their discretion on that point? By doing, well... If it's just completely made up of whole cloth, there's no evidentiary support for it, that's an abuse of discretion. And then shouldn't the parents, if you never communicated with the parents and it shouldn't have mattered in any event, shouldn't the parents get paid in full? No, and I think that really goes back to the main issue of, as you said, there isn't evidence about the need for the sensory room in the first place. So the district court's decision that that was a failure of fate because it wasn't provided for somehow, there's not an evidentiary basis for that. Well, if that never happened until October, right? Because it happened in the reconsideration opinion where that sensory room is actually discussed, right? It's in the court's original decision. That was a basis for saying that FAPE was not provided because there wasn't a sensory room. I mean, that was the whole basis then for limiting the reimbursement because the court then said later on there was. But again, Dr. Constantino, who wasn't at an IEP meeting, whose testimony shouldn't have been considered under the Gill decision and others because that information wasn't available to the IEP team at the time it developed the IEP. I thought, no, I thought opposing counsel said they had the information before the meeting. So the record's wrong? The recommendation that was not even directly from Dr. Constantino, but his testimony. When was his testimony submitted then? Well, he testified at the hearing. At the district court hearing? The due process. No, the administrative hearing. Oh, okay, the administrative hearing. But isn't it typical for an IEP that you don't ask a child psychiatrist to come to an IEP? You get a letter from the doctor, right? Actually, I was just in an IEP meeting last week with a psychiatrist, Your Honor. Well, if you were there, it's probably a pretty contested hearing. Well, you know, you'd be surprised. It's not all the time, school district lawyer and IEPs. No. Actually, we have pretty good relationships a lot of times. But isn't it typical that you will rely upon a doctor's letter? It's information that is used or can be used. I think if you look, and I don't remember the citation exactly, I know there are cases that are referred to, an IEP team has no obligation just to accept recommendations. No, I understand they don't have the obligation. But isn't it typical that the doctor will not be there in person, but the doctor will provide a letter or some kind of written communication? It's probably more often that they're not there. But I've had them appear by telephone also. Was the sensory room, the recommendation for the room, submitted in the letter that the IEP team had from the doctor? No, so if you look at the recommendation, it doesn't say anything about a sensory room. It says a sensory diet. And that's where, if you look at the record, and it's something the district court didn't really address, was if there was any evidence whether or not the provisions in the IEP with respect to OT could provide what even Dr. Constantino recommended. And so to me, that's where you talk, when you ask about the burden of proof, that's part of the problem with the district's court decision. Because it was looking for, essentially for the commission and the district to provide a convincing explanation, rather than looking at the evidence, as the commission correctly did, to see whether or not the parents had met their burden of proof. And so with respect to the sensory part, the commission looked at that, and noted there was conflicting evidence over the years about any benefits from it. But also, there was no real explanation of why whatever they were asking for couldn't be provided. If you look at how Dr. Constantino and how Mr. Hagan explained OT services and how those could be provided, they're virtually the same. And basically, the idea is the occupational therapist will work with the teacher, work with other people working with the student, and develop a sensory diet. So basically, it's sensory interventions that a student might use. And then some sense of how they might be used and when. And one of the important parts of that service is that it allows for flexibility. Because things change over time. One of the things that Dr. Constantino acknowledged was the importance of knowing what motivates a student. And knowing that from school personnel. That's information he didn't have. He didn't speak to personnel. He had never been in a classroom to observe DL. Courts routinely acknowledge the importance of having and relying on information from school personnel who were in a school classroom with a student, who work with a student. Even if it's only seven days like Mr. Hagan. Because that's seven more than Dr. Constantino. In a great circle, they had two months. So that's the evidence that's important to rely upon. But again, if you look at the issue of the sensory, there's no one who said that the provision in the IEP was not sufficient to meet the needs that DL had. There was unrebutted evidence from Mr. Hagan, from the great circle staff, that they provided sensory activities to DL. And that initially may have used them to some extent, but then he really didn't. There was no evidence that they didn't do it properly. That they just didn't actually do it and were making that all up. Or that what they reported about DL was somehow not correct. That was the information the team had the time it developed the IEP. Which also leads to another error that the judge in the district court made, when he found that there was a contradiction in the IEP. He felt that because in one section it referenced needs for sensory, and in another section it referenced the fact that he wasn't currently using, that that was a contradictory, but that's not. What that shows is that the district court really didn't understand the contents of the IEP and how it works. One of the fundamental reviews for a court in a case like this is the acknowledgement that courts aren't experts in educational policy. And reflecting that common sense thing that most of the time judges aren't professional educators or haven't been. And so a certain level of deference that goes to the decisions made by school personnel because of that. And so in this case, in the IEP, there's a section at the beginning that talks about the student's disability and how it impacts the student's ability to participate in the general curriculum. That part describes the child's disability. The basic idea is these are the needs the child has that we're going to address in the rest of this IEP. So basically it's why do you have an IEP? The other part though that the judge looked at is a part that addresses changes in the current functioning of the student. And that is exactly what it is. Since the last IEP, what's changed with the student? So generally what you have is information about progress on goals. Maybe it's lack of progress. But it's how things have changed. So in this case, that was the observations of the school personnel. The DL wasn't using the sensory activities at the time. That was just a matter of fact. They can't report something other than what they were observing. So then you put those together. And the changes in functioning part really helps explain the change in services that were based on the needs in that first part. So there's not a contradiction. That's how the IEP works. So that's not a basis for ruling against the district nets. Because the IEP does what it's supposed to do. You know, I want to go back to this whole sensory diet. Now as I understand the sensory diet is just a broad spectrum of activities that the student needs to engage in in order to stay focused and able to function. Because of the needs that autistic children have. And so it can be as basic as setting aside time for someone to play with therapeutic sand or Play-Doh. It could be sending them off to someplace to do jumping jacks and physical exercise. But it could also include putting people in a sensory deprivation room where you just kind of take away all stimulus and tell them to just settle. Right? So all those things could be. And so why is the district judge wrong when you look at the specific identified problems that this particular student had? The history of post-traumatic stress disorder, the neglect, all the inherent problems, the bladder and bowel control and problems under stress. I mean, all these things that are going on that are all brought on by external stimuli. Why is the court not able to say that based on the physical observations, based on the diagnoses that's been presented, based on the sensory diet testimony in the hearing, that the deprivation room is necessary for this child? Why is that not a reasonable inference that can be drawn? Because there's not evidence to support that. There was no testimony about that. There was no other evidence about that. And I think that also it's important to go back to the recent decision in Andrew F. An IEP is based, and the fundamental premise of the IDEA is that a student's needs are based on their unique circumstances. Their unique needs. So for every student, you're supposed to identify what are their needs. So with respect to a sensory diet, you are correct, Your Honor, that it can be a lot of things. You know, sensory stuff could be you sitting tapping your pen while you listen to this argument. That kind of stuff. So yeah, it could be. The point is that it was the parent's burden to show that it had to be for D.L. to receive FAPE. Because FAPE is about not just what's good for a kid. It's about the stuff that a kid has to have to reasonably be able to make educational progress. And not maximum progress, even at that. So the bottom line, it's not in the evidence and it's not consistent with the law, then just to take that leap based on really nothing. There's one really, to me, important, practical impact of this case that I think the Court has to consider. And that is the District Court's rejection of the Commission's credibility findings. In their briefing below, the parents specifically challenged the credibility of the Great Circle staff members and talked about their experience and all that. The Commission directly addressed that. It noted that there's varying degrees of experience. At the District, you had Mr. Hagan, who had taught for, I think, 10 years. He also happens to have a child who has autism. He has a sister who has autism. He's taught children with autism. He's familiar with sensory, so he knows his stuff. At Great Circle, there were varying degrees of experience. The Commission looked at that evidence and determined that it could rely on that evidence. And it was consistent with each other. It was consistent over time. If you look at the last IEP before the November 11th IEP, one of the things it mentioned in there was the inconsistent use of sensory. So it wasn't new in November to have that information. And so the Commission relied on that information. Also, with respect to behaviors and how sensory might be impacting that, it looked over time that there were consistent reasons given for D.L. and the behaviors he exhibited. It was even consistent with giant steps eventually reported. And the bottom line was that, for the most part, D.L. liked what he liked to do. If he didn't want to do it, that's where problems came up typically. And that was in the records consistently. So the Commission looked at that information and decided it could rely upon that. The District Court didn't really address the fact that there was no contradiction of the testimony by the Great Circle people. Instead, it really looked at the credentials. And it noted that... It referred to Dr. Constantino's expertise in research and treating children with autism. It doesn't say anything about educating children with autism. It doesn't say anything about knowing anything about occupational therapy. It leaves out the fact that he never saw D.L. in a classroom. Over five years, Dr. Constantino spent a total of about 10 hours with D.L. None of that spoke with him, maybe three and a half. There's absolutely no way to compare that. You can't compare that experience with the experience of the classroom people who had actually worked with D.L. So as far as the credibility determination then, the judge really relied on credentials. And noted the disparity in credentials. And decided that the Commission and the District Court should have listened to Dr. Constantino. In real life, the problem for school people at this point is like, well, with this decision, how do we know then when we have enough experience, if we have enough time with the student and all that, that we can rely on what we see in the classroom? And when do we just have to defer to someone who is an expert who has given us a letter that says something different? And I've probably been approaching a thousand IEP meetings at this point in my career. I don't think the process can function if it functions in that way. Schools and IEP teams have to be able to rely on the observations of the people who were in classrooms with the students. I see my time is up. Thank you. Thank you. Ms. Hunt? Yes. So a few points here. First, I would like to say that the record does, in fact, the transcript of Mr. Hagan's testimony states that he emailed the parents. And that is found at page 454 of the transcript. I think that Mr. Brink is oversimplifying the district court's order. He did not find that FAPE was denied simply because Madison does not have a sensory room. He found that FAPE was denied because after looking at, and another issue is that he found this based on the evidence in the record. He didn't find this based on Dr. Constantino's testimony. He found it based on the testimony contained within the IEPs and evaluations spanning back to 2012 that were conducted by the district. The district said he needs sensory support. The district says that he has definite dysfunction in his sensory needs. But the IEPs are snapshots, as you pointed out in your argument. And I think the argument of counsel was currently the IEP suggested he didn't have some of those issues. But in fact, it didn't. Even the 2017 IEP says from Ms. Johnson, who was his OT at Melanthi, that he had definite dysfunction in his sensory needs. The quibble here is that a nine-year-old did not volunteer to go use these sensory supports. Or when he's having a meltdown and he's propositioned with the question, would you like to go to the sensory room, he unsurprisingly says no. I have a three-year-old niece who would not choose to eat vegetables if we did not make her. But that is what we have to do as educators and as parents. This is a service. This is not an activity. This is something that needs to be created by a professional and implemented by a professional. And Mr. Brink is correct in stating that these sensory diets are created by OTs. But how can they do so in this case if they have eliminated all of the occupational therapy direct minutes? So there are many reasons why the IEP denied FAPE. Not just the lack of sensory room, but the direct OT minutes were taken out of the IEP despite the fact that every single IEP and evaluation conducted by the district, including the 2017 IEP, said that he needed it. And because Madison couldn't support him. It couldn't support him not just because of the sensory room, the principal himself said at the hearing. So this is when everything is supposedly better. At the hearing. This is not a place for kids who can't control their behavior. Every person who has seen this child knows that he is autistic and that his behaviors are driven by his disability. He doesn't bang his head against the wall because he's bad or because he chooses to do so. It's because his symptomology, that is how he adapts to the sensory deprivation. And if I can briefly address this deference standard. So, due weight should be given to the results of state administrative proceedings. That is true. And the court needs to make independent decisions based on a preponderance of the evidence. But the required deference to the opinions of professional educators does not relieve the hearing officer or the district court of the obligation to determine whether a given IEP is appropriate. So, these... Essentially, the district court pointing out that the individuals who are making these decisions, so we're looking at people who've seen DL for two months, overriding years of IEPs conducted by the district itself. That goes to the weight of the evidence. And because there was no weight behind it, even if we take out Dr. Constantino's testimony, even if we take out the parents' testimony, even if we take out Giant Steps, or everyone else, their own documents say that he needs it, and they ignored it. Because he didn't feel like using those services. So, to be clear, we are asking for the opinion, as far as the denial of FAPE, to be upheld. This IEP denied FAPE, there's no doubt about it. However, the result of reducing tuition by 70%, we believe, should be overturned. There's not evidence to support it, and the court committed clear error in concluding otherwise. If there are no further questions? Thank you. Thank you very much for your arguments. The case will be taken under advisement.